In re Paulette **PETERSON**, Debtor.

No. 04–10109.

United States Bankruptcy Court,
W.D. New York.

Aug. 31, 2004.

---

David F. Butterini, Kenmore, NY, for Debtor.

MICHAEL J. KAPLAN, Bankruptcy Judge.

This case squarely presents an issue that the Second Circuit in *In re Pond,* 252 F.3d 122 (2nd Cir.2001), declined to address when it explicitly (but without guidance) rejected the advice given by one Panel of the 11th Circuit in *In re Dickerson,* 222 F.3d 924 (11th Cir.2000).

In the *Dickerson* case, the Panel stated that if it were not constrained by the 11th Circuit's "prior panel" rule (of horizontal *stare decisis*), it would *reject* the notion that a wholly unsecured mortgage may be avoided despite *Nobelman.* The Panel said "... [P]roviding 'antimodification' protection to mortgagees where the value of the mortgage property exceeds the senior mortgagee's claim by at least one cent ... but denying that same protection to junior mortgagees who lack that penny of equity, *places too much weight upon the valuation process.* As we have noted '[v]aluation outside the actual market place is inherently inexact ...' Given the unavoidable imprecision and uncertainty of the valuation process, we think that choosing to draw a bright line at this point is akin to attempting to draw a bright line in the fog."* [Emphasis mine.]

The Second Circuit in *Pond* explicitly noted that dictum in *Dickerson* when it chose to align this Circuit with the *prior* ruling by the Eleventh Circuit, and with other authorities.

Here now is a case in which the Debtor's appraiser competently appraised the home at $113,000, and the Second Mortgagee's appraiser just-as-competently appraised the home at $125,000. The First Mortgage lien is $114,118. The Second Mortgage payoff is approximately $22,200.

The Debtor's Plan will pay 5% to unsecured creditors. Consequently, the Second Mortgagee will receive $22,000 plus a "present value additive" if the Court finds the home to be worth at least *$1,118.01 more* than the Debtor's $113,000 appraisal, but will receive only $1100 otherwise—a difference of more than $20,900.

For all but one other purpose under the Bankruptcy Code, a decision of the Court clearly would never be found to be an abuse of discretion no matter where it set the value along the $113,000—$125,000 continuum. The amount in controversy would be $12,000; an amount that is less than 10% of the fair market value. In effect there would be a 10% "margin of error." (The other purpose for which a valuation might not permit a "margin of error" is 11 U.S.C. § 1111(b)(1)(B)(i).)

Here, however, the amount in controversy is *more than $20,900 and is decided by* whether the Court fixes the value at somewhere between $113,000 and $114,118, on the one hand, or at some value above that, on the other hand.

The $1,118 "window of opportunity" for the Debtor here is less than 1% of her appraised value. The Court is given almost no "margin of error."

As is often the case when appraisers disagree over the value of a single family home, the dispute is with regard to the "comparables." The Debtor here bought her ranch-style home for $51,900 in 1985. She paid about $25,000 in 1990 to add a

second story containing three small bedrooms and a bath. The second story rises only over the center portion of the first floor. The three added bedrooms plus bath were in an added space of 27' by 23'. After providing for a landing, the four bedrooms averaged about 9' by 12'. These might be considered big rooms in Manhattan, but not in Western New York.

It was no longer a ranch-style home. It is agreed that there are no direct comparables—no ranches with a limited two-story addition have been sold recently in any similar neighborhood. The *Debtor's* appraiser considered and rejected the notion of using two-story colonials as "comps" because the three bedrooms that were added upstairs made a total of six bedrooms and this was by no means comparable to a "six bedroom colonial." Rather, this was a ranch with "an addition of [what he called] one bedroom and ' two dens'." So he used *split-level* homes for two of his three comps.

The *Mortgagee's* appraiser considered and rejected "splits" as comps. Splits have below-ground-level square footage and/or steps both up and down from the front entrance. In his view, center-entry colonials are the most comparable.

Both positions are, in this writer's substantial experience in these matters, defensible.

This fact has profound meaning. It means that either the Debtor's appraisal is the "best evidence" of value or the Lender's appraisal is the "best evidence" of value. The Court cannot simply split the difference as it might in so many other contexts. To do so would be to say "The Debtor loses," on an arbitrary basis.

■ And so the question for the Court is whether the Debtor has carried her *burden of proof.* The burden is hers because *In re Pond* simply holds that a Chapter 13 plan may modify a wholly unsecured claim under a Plan. A debtor always has the burden of convincing the Court of the various requisites to confirmation of a Chapter 13 Plan: feasibility, good faith, compliance with the applicable provisions of the Code, etc.

What is the measure of proof of value to overcome *Nobelman,* under *Pond?* Is it fair preponderance," "clear and convincing," or some other standard?

■ At the close of the evidentiary hearing on June 29, 2004, the Court ordered briefs on this issue. It is now agreed between the parties that [1] "fair preponderance" is the applicable standard. (See *Southard v. Curley,* 134 N.Y. 148, 31 N.E. 330 (1892); *Werzberger v. Union Hill Constr. Corp.,* 30 N.Y.2d 932, 287 N.E.2d 380, 335 N.Y.S.2d 686 (1972).) *Based on that standard,* the Debtor's Motion will be sustained. In my view it is more probable than not that the Debtor's Appraiser's "comparables" are the better measure of value, and that the use of center-entry colonials as the "comps" in the Lender's appraisal yields an incorrect value.

It is well-known locally that a ranch-style home is more expensive to build per square foot of living space than other styles. For example, a 1600 square foot ranch has a roof that covers 1600 square feet. But a 1600 square foot *colonial* has a roof that covers only 800 square feet. The same is true as to the foundation and its excavation, backfill, grading and landscaping. Plumbing and heating runs are longer in a ranch than in a home in which bathrooms are directly above a kitchen or above another bathroom, and where bedrooms often are directly above other heated space.

1. Because of the agreement, the Court expresses no opinion on the question.

These same factors often make ranches more expensive to maintain, to heat, and to improve. Consequently, the re-sale market for ranches is very dependent on the location. Is it a neighborhood favored by seniors, who often desire a single-floor layout? Is it a working-class neighborhood in which higher maintenance costs might depress the value of a ranch? And so forth.

The fact that even the Lender's appraiser chose not to use ranches as comps suggests either than ranches are not well-valued in the neighborhood in question, or that the "addition" here reduced, rather than enhanced, the resale value of the home. Where a ranch would not be favored, a ranch with the added costs of an irregular roofline and its added flashing (where leaks can originate), a higher roof segment on which gutter maintenance is not so simple as on a ranch, etc., may be even less favored. It is a house with the disadvantages of ranches, and few of the benefits of two-story homes.

If the ranch attributes would have been highly-valued in the neighborhood, on the other hand, this particular addition apparently more than negated that value, or else the lender's appraiser would have used ranches as comps. Perhaps this addition's stairs or structural supports, or utility runs, etc., interfered with the traffic-flow of the ranch-style first floor.

In any event, because neither appraisal used ranches (or capes, raised ranches, garrisons, or other styles) as comps, the question for the Court is whether splits or colonials were more likely to produce the correct value.

It is the view of this writer that splits are more likely to produce the true value of the dwelling at issue.

Here in Western New York, the most saleable suburban home has for years been the four-bedroom, two and a half bath colonial. That does not make it the most valuable; merely the home with the largest market. And there are a great deal of such homes.

By choosing center-entry colonials only as comps (and having rejected the use of ranches) the Debtor's appraiser has opined that this house tends toward the most desirable of Western New York properties. Splits, on the other hand, have good and bad. They have the multilevel roofline (harder and more expensive to maintain), but few steps to climb. Some splits have below-grade living space (the slab floor is cold, and the view is of the backside of the foundation plantings), but the upper-level bath is often just a short vertical expansion of the kitchen plumbing (or of a first floor bathroom plumbing). Other splits put the garage under the bedrooms (making the bedrooms harder to heat), but fit on a smaller lot, and so put more value into the structure than into the land. There are many other trade-offs.

In sum, I agree with the Debtor's appraiser's choice of splits as comps, rather than the choice of center-entry colonials. And since the parties agree that "fair preponderance" is the standard, the Debtor has carried her burden.

Debtor's counsel may submit the usual proposed Order under *Pond*, for recordation in the Court Clerk's Office. The second mortgage will be void if the Debtor completes her Plan.

SO ORDERED.